**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THOMAS SLOANE, individually and on behalf of all persons similarly situated, | : : : : | No. 4:16-cv-01571<br><br>(Judge Brann) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| GULF INTERSTATE FIELD SERVICES, INC., | : : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

**March 24, 2017**

## I.    INTRODUCTION

"This is the second attempt by the same counsel to seek certification of a collective action wage and hour lawsuit on a <u>nationwide</u> basis against Gulf Interstate Field Services (GIFS). The first attempt failed."[1] As might be expected, this second-chance effort has fared no better than the first. "Put simply, the old adage that 'if at first you don't succeed, try again' does not apply to litigation in federal court."[2]

---

[1]    Def.'s Br. in Opp. to Pl.'s Mot. for Conditional Certification, ECF No. 156 at 8.

[2]    <u>Boone v. United States</u>, No. 02-CR-1185 (JMF), 2017 WL 398386, at *2 n.1 (S.D.N.Y. Jan. 30, 2017).

This Fair Labor Standards Act case was brought on behalf of a putative class comprised of natural gas pipeline inspectors. In essence, the class members allege that they were paid a day rate with no accounting for overtime worked. Numerous features of this litigation are fatal to the class's success: (1) significant disparities exist among the putative class members, their worksites, their responsibilities, and their clients—there is no common thread; (2) individualized inquiries as to the applicability of certain exemptions would overwhelm collective resolution; (3) applicable payroll records reveal that they were likely paid a salary; and (4) the pay letters at issue are at worst ambiguous and at best clarify that the workers actually received a salary guarantee.

Moreover, I observe from the outset that this is not a putative class comprised of minimum wage earners who perform rote tasks in less than ideal conditions. This is a class of professional pipeline inspectors—one of whom took home an annualized salary of $140,500—that nevertheless now seek to utilize the FLSA's overtime provisions to obtain additional pay they claim they are owed.

Counsel for Plaintiff has already failed to obtain nationwide certification in a related matter pending before the United States District Court for the Southern District of Ohio. In fact, not only was certification of a collective action denied in part, but summary judgment was eventually granted in GIFS's favor in that case.

A few months later and following a radio campaign that sought to recruit potential gas workers to serve as class members, that same counsel arrived at this Court's doorsteps, armed with a new class representative but the same old theory.[3] Technically speaking, they first arrived at a neighboring district from which counsel for Plaintiff had recently won a favorable judgment in another case.[4] Regardless, when the court in that district realized in July 2016 that venue was nonexistent, the case was swiftly punted to this Court. Venue, as it turns out, was improper in that district because the lone putative class member from Pennsylvania had never even worked in one of the counties that comprise that forum.

This Court held a telephonic status conference on August 29, 2016, at which time a formal briefing and oral argument was scheduled on the pending motions for conditional certification under 29 U.S.C. § 216(b) and class certification under Federal Rule of Civil Procedure 23. That conference followed a letter from Veronica Saltz, Esquire, counsel for Defendant, which both informed the Court of

---

[3] See Transfer Memorandum, ECF No. 136 at 8 (Fischer, J.) ("Sloane became involved in this matter after hearing a radio advertisement several times during the period of March through August of 2015 when he was working in the Corpus Christi, Texas area for another employer. He confirmed that the radio advertisement told listeners that they may be entitled to unpaid overtime compensation under the FLSA if they were paid a 'day rate.' The advertisement directed listeners to contact Bruckner Burch PLLC if they desired to pursue a claim.").

[4] Hively v. Allis-Chalmers Energy, Inc., No. CIV.A. 13-106, 2013 WL 5936418, at *8 (W.D. Pa. Nov. 5, 2013) (Fischer, J.).

the parallel Ohio action and expressed skepticism that this case could be meaningfully distinguished from that one.

This Court held a day-long oral argument on November 21, 2016. For all of the distance it seems we must have traversed, we have had to endure, we still find ourselves at the same place where we began. For the reasons set forth below, Plaintiffs have fallen well short of satisfying their burdens under the Fair Labor Standards Act as well as Federal Rule of Civil Procedure 23. Accordingly, both certification motions are denied, and the putative opt-in Plaintiffs are dismissed with prejudice.

## II.    BACKGROUND

### A.    Significant Variance Is Present Among GIFS's Inspectors, Clients, Worksites, Job Responsibilities, Discretion, And Projects.

GIFS staffs its clients' projects with many different types of inspectors, including: Chief Inspectors, Assistant Chief Inspectors, COR Inspectors, Corrosion Inspectors, Electrical and Instrumentation Inspectors, Environmental Inspectors, Safety Inspectors, Utility Inspectors, Welding Inspectors, and Coating Inspectors.[5] Each type of inspector possesses different qualifications and expertise, and performs different job duties.[6] Nevertheless, Plaintiffs seek certification of collective action generically comprising "all current and former employees of

---

[5]    ECF No. 156 at 12.

[6]    Id.

[GIFS] who performed work as a pipeline inspector in the United States in any workweek between three years prior to the date of the Court's Order and the present."[7] The proposed class otherwise embraces no limitations based on geography, timeframe, client, position type, or project nature, though it does incorporate a carve-out for three separate projects where employees are believed not to have suffered any unlawful treatment.[8]

Since 2011, GIFS has staffed approximately 2,275 employees with over 40 clients across at least 35 states, both on- and off-shore.[9] As Robert J. Sprick, the company's Senior Vice President, testified, "[t]he number and type of jobs staffed by [GIFS] on any particular project also varies considerably from project to project, client to client, and over time."[10] This means that "similarly titled jobs, like 'pipeline inspector,' often entail different job duties from project to project, as each client sets the job duties for each [GIFS] employee on its projects."[11]

GIFS "generally has no authority to direct the tasks performed by its employees on its clients' respective projects, or control when or how such tasks are performed."[12] Instead, GIFS's clients "generally assign work to [GIFS's]

---

[7]    ECF No. 141 at 1.

[8]    See id.

[9]    Sprick Feb. 20, 2015 Decl., ECF No. 99 Ex. 7 ¶ 6.

[10]   Id. ¶ 9.

[11]   Id. ¶ 10.

[12]   Id. ¶ 11.

employees, and [GIFS's] employees exercise various levels of discretion and independent judgment in performing their assigned tasks."[13] "Job duties also may vary depending upon the portion of a particular project that an employee is assigned, as conditions can vary at different parts of a worksite."[14]

Because GIFS is a staffing company, its inspectors' relative positions in the organizational structure is client-dependent.[15] As stated, "inspectors are staffed for each particular project according to the needs of GIFS's clients," and "[s]upervision of inspectors may differ on a project-by-project basis depending upon the individual supervisor assigned by the client."[16] Accordingly, GIFS's various clients, not GIFS, "control[ ] each staffed employee's work schedule, whether the job site is open for work on any particular day, and any applicable sick leave and vacation policies."[17]

**B. The Hughes Court Rejects Counsel For Plaintiff's Day Rate Theory In A Nearly Identical Action In The Neighboring State Of Ohio.**

In 2014 and before this case's inception, counsel for Plaintiffs filed a strikingly similar complaint in the United States District Court for the Southern District of Ohio. That case was captioned Hughes v. Gulf Interstate Field Servs.,

---

[13] Id.

[14] Id. at 10.

[15] ECF No. 156 at 12.

[16] Sprick May 6, 2016 Decl., ECF No. 99 Ex. 8 ¶ 8.

[17] Sprick 2015 Decl. ¶ 16.

Inc., and it involved nearly identical allegations, save for the differences occasioned by the application of Ohio state law to the plaintiffs' pendent claims.[18] In particular, the Ohio lawsuit alleged that GIFS paid its inspectors a day rate.[19]

Counsel for Plaintiffs' geographical blunders (or creativity) have unfortunately been featured as a common theme in their litigation against GIFS. Importantly, though, there is something obviously proper to be said for Plaintiff's counsel having taken their first bite at the apple in the buckeye state—after all, that's where the named and opt-in plaintiffs in Hughes actually worked.

The telling nature of that initial choice of venue will come into play again later in my discussion, but suffice it to say for now that the Ohio action was a failed endeavor. In fact, the Honorable Edmund A. Sargus, Jr., determined that the plaintiffs could not even "make a modest factual showing" that a nationwide collective should be certified.[20] Because all five of the opt-in plaintiffs were culled from the MarkWest Ohio project, Judge Sargus did conditionally certify a class consisting only of those inspectors who worked at that lone Ohio job site.[21] As to the motion for conditional certification, he concluded that "Plaintiffs submit no

---

[18]  S.D. Ohio Docket No. 2:14-cv-00432.

[19]  Hughes v. Gulf Interstate Field Servs., Inc., No. 2:14-CV-000432, 2015 WL 4112312, at *1 (S.D. Ohio July 7, 2015).

[20]  Id. at *3.

[21]  Id. at *3–4.

sufficient evidence to support a conditional class outside of the Markwest Ohio

Project."[22]

At the same time, Judge Sargus also denied Plaintiffs' motion for

certification under Rule 23. He reasoned as follows:

> The applicability of each of these exemptions involve fact-specific
> inquiries regarding an employee's specific job duties—whether
> management, business-operations, office or nonmanual etc.; the
> independent judgment exercised in the performance of said duties, the
> percentage of time devoted to each duty; and the supervisory capacity,
> if any, of each employee. While Plaintiffs' employee affidavits touch
> on the answers to some of these questions as they pertain to the
> individual affiants, Plaintiffs have not satisfied their burden of
> demonstrating that all individuals in the proposed class would have
> common answers, such that a determination of whether these
> exemptions apply is capable of classwide resolution.[23]

Approximately one year later, GIFS moved for summary judgment as to

Plaintiffs' FLSA claims, and summary judgment was granted. Like the matter sub

judice, summary judgment in Hughes turned on the applicability of a number of

the FLSA's regulatory exemptions.[24] Those exemptions depended upon whether

GIFS' employees were "paid on a salary basis."[25]

Judge Sargus relied on Sixth Circuit precedent for the proposition that

"employment agreements are no longer the relevant starting point for whether an

---

[22] Id. at *3.

[23] Id. at *6.

[24] Id. at *3.

[25] Hughes v. Gulf Interstate Field Servs., Inc., No. 2:14-CV-000432, 2016 WL 4197596, at *4 (S.D. Ohio Aug. 8, 2016).

employee is paid on a salary basis."[26] The motivation behind such a rule is that what controls is not what the employee was owed, but what he actually received.[27] "It is not written descriptors of the payment policies that are relevant to the salary-basis test inquiry, but rather the actual payment practice," Judge Sargus concluded.[28] Thus, because the plaintiffs in <u>Hughes</u> "were actually paid the requisite amount to satisfy the FLSA's salary-basis requirement," the exemptions applied, and summary judgment was appropriate.[29]

### C. This Case Is Transferred To This District, And Oral Argument On Both Certification Motions Is Heard.

The present matter was initiated in the Western District of Pennsylvania on September 16, 2015. Plaintiffs filed their motion for conditional certification and to facilitate notice pursuant to 29 U.S.C. § 216(b) on April 8, 2016. The Honorable Nora Barry Fischer, to whom the case was assigned at that time, heard oral argument as to that motion on May 26, 2016. Later, Plaintiffs motion for class certification pursuant to Federal Rule of Civil Procedure 23 was filed on June 27, 2016. The matter was transferred in its entirety to the undersigned on July 29, 2016. This Court conducted a telephonic status conference call on August 29, 2016, at which time it finalized the remaining deadlines for responsive briefing on

---

[26] <u>Id.</u> at *4.

[27] <u>Id.</u>

[28] <u>Id.</u>

[29] <u>Id.</u>

Plaintiffs' Rule 23 certification motion. Thereafter, oral argument as to both motions was held on November 21, 2016.

### D. The Named Plaintiffs And Opt-in Plaintiffs Exhibit Significant Variance In Terms Of Their Employment.

This section provides a brief factual comparison of several central factors about the named Plaintiff and the five opt-in Plaintiffs on whose behalf verified consent forms have been filed on the ECF docket. I list the opt-in plaintiffs in the order in which each's notice of consent to opt-in was electronically filed by Plaintiff's counsel on the Court's docket.

### 1. Named Plaintiff: Thomas Sloane

In early 2014, Kinder Morgan hired GIFS to staff inspectors on a compressor station expansion project along a natural gas pipeline in Wyalusing, Bradford County, Pennsylvania.[30] That compressor station is referred to internally as "Station 319."[31] GIFS sent eight inspectors, including Mr. Sloane, to the Station 319 project.[32] That project began in early January 2014 (although Mr. Sloane's work there did not begin until April 2014).[33] His work on that project ended in

---

[30]  Robert J. Sprick May 6, 2016 Decl., ECF No. 99 Ex. 8 ¶ 23.

[31]  Id.

[32]  Id.

[33]  Id.

September 2014.[34] Thereafter, Mr. Sloane worked for approximately one month on an unrelated project for the same client in Oklahoma.[35]

### 2. Opt-in Plaintiff #1: Allen Hinkle

Mr. Hinkle worked for GIFS from approximately August 2012 through December 2012 as a Welding Inspector in West Virginia on a project for MarkWest Liberty Midstream & Resources, LLC.[36] He then worked for GIFS from approximately October 2013 through March 2014 as a Welding Inspector in Missouri on a project for Enbridge Energy Partners, L.P.[37]

### 3. Opt-in Plaintiff #2: Justin Bish

Mr. Bish worked for GIFS from approximately June 2011 through October 2013 as a Utility Inspector in West Virginia on a project for MarkWest Liberty Midstream & Resources LLC.[38] From approximately October 2013 through February 2014 he worked for GIFS as an Assistant Chief Inspector in West Virginia on a second project for that same client.[39] Finally, from approximately

---

[34] Id.

[35] Catherine Kramer May 6, 2016 Supp'l Decl., ECF No. 99 Ex. 6 ¶ 4.

[36] Hinkle Apr. 4, 2016 Decl., ECF No. 85 Ex. 23 ¶ 4.

[37] Id. ¶ 3.

[38] Bish Apr. 4, 2016 Decl., ECF No. 85 Ex. 24 ¶ 4.

[39] Id. ¶ 3.

February 2014 through March 2014, he worked with GIFS as an Assistant Chief

Inspector in Ohio on a project for MarkWest Energy Partners, L.P.[40]

### 4. Opt-in Plaintiff #3: Richard Stapleman

Mr. Stapleman first worked for GIFS from approximately October 2013

through December 2013 as a Quality Control Inspector in Arizona on a project for

Kinder Morgan.[41] He then worked for GIFS from approximately March 2015

through April 2015 as a Chief Inspector in New Mexico on a project for Kinder

Morgan.[42] He next worked for GIFS from approximately April 2015 through May

2015 as a Chief Inspector in Texas on a project for Kinder Morgan.[43] Finally, he

worked for GIFS from approximately May 2015 through June 2015 as a Chief

Inspector in Arizona on a project for Kinder Morgan.[44]

### 5. Opt-in Plaintiff #4: Rodney LaLonde

Mr. LaLonde first worked for GIFS from approximately March 2012

through May 2012 as a Field Engineer in West Virginia on a project for MarkWest

Energy Partners, LP.[45] He worked on that same project from approximately May

---

[40] Id. ¶ 2.

[41] Stapleman Apr. 7, 2016 Decl., ECF No. 85 Ex. 25 ¶ 6.

[42] Id. ¶ 5.

[43] Id. ¶ 4.

[44] Id. ¶ 3.

[45] LaLonde Apr. 7, 2016 Decl., ECF No. 85 Ex. 26 ¶ 4.

2012 through September 2013 as a Chief Inspector.[46] He then worked for GIFS from approximately September 2013 through September 2014 as a Chief Inspector in Ohio on a project for MarkWest.[47] Shortly thereafter, he worked for GIFS from approximately February 2015 through June 2015 as an Assistant Chief Inspector in New York on a project for the Williams Companies, Inc.[48] Then, he worked for GIFS from approximately June 2015 through July 2015 as an Environmental Inspector in Virginia on a project for Williams Companies, Inc.[49]

### 6. Opt-in Plaintiff #5: Buggs Pollett

Mr. Pollett worked for GIFS from approximately May 2014 through October 2015.[50] During that period, he served as a Utility Inspector for the Gulf South Pipeline Company (Boardwalk).[51] Mr. Pollett was also employed as a Welding Inspector in Mississippi on a Panhandle Energy project for a period of time beginning in or around June 2012.[52]

---

[46]   Id. ¶ 3.

[47]   Id. ¶ 5.

[48]   Id. ¶ 6.

[49]   Id. at ¶ 7.

[50]   Pollett Opt-in Consent Form, ECF No. 75.

[51]   See Pollett June 7, 2012 & June 17, 2014 Pay Letters.

[52]   See id. See also Pollett June 7, 2012 & June 17, 2014 Pay Letters.

7.      **Summary**

The below table is adapted from a similar one submitted by Plaintiffs'

counsel. It summarizes the named and opt-in plaintiffs' job sites, time worked, job

titles, and clients:

**Table 1. Comparison of the Named and Opt-in Plaintiffs**

| Name | Time Worked | States Worked | Job Title(s) | Client(s) |
|------|-------------|---------------|--------------|-----------|
| Thomas Sloane | April 2014-October 2014 | OK, PA | Welding Inspector | Kinder Morgan |
| Allen Hinkle | August 2012-December 2012; October 2013-March 2014 | MO, WV | Welding Inspector | Enbridge; MarkWest |
| Justin Bish | June 2011-March 2014 | OH, WV | Assistant Chief Inspector; Utility Inspector | MarkWest |
| Richard Stapleman | October 2013-December 2013; March 2015-June 2015 | AZ, NM, TX | Chief Inspector; Quality Control Inspector | Kinder Morgan |
| Rodney LaLonde | March 2012-September 2014; February 2015-June 2015 | NY, OH, WV | Chief Inspector; Assistant Chief Inspector; Field Inspector | MarkWest; Williams |
| Buggs Pollett | June 2012; May 2014-October 2015 | MS | Welding Inspector; Utility Inspector | Panhandle Energy; Gulf South Pipeline |

## III.  LAW

In an FLSA case brought on behalf of a putative class, the district court typically evaluates the propriety of certification at two junctures. How closely the court must scrutinize the proposed class each time depends upon whether discovery has yet been made available to the plaintiff. Thus, although district courts apply a less searching standard initially, once discovery is had, any presumption of leniency recedes, and the plaintiff is held to a more demanding burden. In sum, from the plaintiff to whom much discovery is given, much proof is expected in return.

"Although this two-step approach is nowhere mandated, it appears to have garnered wide acceptance," including by the United States Court of Appeals for the Third Circuit and those lower courts within its purview.[53] In fact, in its leading 2012 decision Zavala v. Wal-Mart Stores, Inc., the Third Circuit retraced the contours of this two-tier process and "affirm[ed] its use" for FLSA collective action cases going forward.[54]

The initial stage typically involves a request for conditional certification. "[B]ecause discovery has not yet occurred, courts do not review the underlying

---

[53]  Symczyk v. Genesis HealthCare Corp., 656 F.3d 189, 193 (3d Cir. 2011) (Scirica, J.).

[54]  Zavala v. Wal Mart Stores Inc., 691 F.3d 527, 536 (3d Cir. 2012).

merits of the action in deciding whether to conditionally certify the class."[55]
Instead, the plaintiff need only make a "modest factual showing—something
beyond mere speculation" to obtain conditional certification.[56] This framework
recognizes that conditional certification "is not a true certification, but rather an
exercise of a district court's discretionary authority to oversee and facilitate the
notice process."[57] In particular, the "sole consequence" of conditional certification
is the issuance court-approved notice to potential class members.[58]

     "At the conclusion of discovery . . . the court then makes a second
determination, utilizing a stricter standard of 'similarly situated.'"[59] This second,
more probing stage is where the rubber meets the road for FLSA collective actions.
"[P]laintiffs must satisfy their burden at this second stage by a preponderance of
the evidence."[60] A showing that opt-ins are similarly situated to the named plaintiff
is "impossible unless Plaintiffs can at least get over the line of 'more likely than
not.'"[61] "Relevant factors include (but are not limited to): whether the plaintiffs are
employed in the same corporate department, division, and location; whether they

---

[55] John v. Nesco Serv. Co., No. 4:15-CV-253, 2016 WL 7757388, at *2 (S.D. Tex. June 10, 2016).

[56] Halle v. W. Penn Allegheny Health Sys. Inc., 842 F.3d 215, 224 (3d Cir. 2016) (Smith, C.J.).

[57] Id. (citing Hoffman–La Roche v. Sperling, 493 U.S. 165 (1989)).

[58] See Halle, 842 F.3d at 224.

[59] Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1102–03 (10th Cir. 2001).

[60] Id. at 537.

[61] Id.

advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment."[62] "Plaintiffs may also be found dissimilar based on the existence of individualized defenses."[63]

Although a motion to decertify typically attends this stage, what sets the second step apart from the first is the existence of discovery dispositive to the ultimate issues. In fact, the Third Circuit in Zavala referred to the second step as the "post-discovery stage."[64] Accordingly, district courts in this circuit have applied an intermediate standard to the "similarly situated" inquiry if the parties have already engaged in discovery.[65] Courts have held this intermediate standard to require "some factual showing that the similarly-situated requirement is satisfied," "as a result of the discovery as measured against the original allegations and defenses."[66]

As one district court recognized, applying the intermediate approach helps "the Court [to] make an educated decision as to whether certifying this matter as a

---

[62] Id. at 536–37.

[63] Id. at 537.

[64] Zavala, 691 F.3d at 536.

[65] See, e.g., Villanueva-Bazaldua v. TruGreen Ltd. Partners, 479 F. Supp. 2d 411, 415 (D. Del. 2007).

[66] See id. Creely v. HCR ManorCare, Inc., 789 F. Supp. 2d 819, 827 (N.D. Ohio 2011).

collective action would survive the decertification process."[67] To proceed otherwise "would be an exercise in futility and wasted resources for all parties involved."[68] "Although the burden for certifying a FLSA lawsuit for collective action notification is light, there are limits, and the district court cannot function as a rubber stamp for any and all claims that come its way under this statute."[69] "Consistent with this principle, courts have the responsibility to avoid 'stirring up' litigation through unwarranted solicitation."[70]

Whether the named plaintiff and the proposed opt-ins are similarly situated is a factual question.[71] Thus, when a district court adheres to the legal standard annunciated in Zavala, its determinations are reviewed for clear error.[72]

## IV.   ANALYSIS

### A.   Prevailing Legal And Equitable Principles Demand That This Court Reject Plaintiff's Second-Chance Attempt To Certify A Nationwide Collective Action of Pipeline Inspectors.

#### 1.   Because Plaintiffs have engaged in significant discovery in the three years since the Hughes case was initiated, they must offer something more than a modest factual showing to obtain certification.

---

[67] Basco v. Wal-Mart Stores, Inc., No. CIV.A. 00-3184, 2004 WL 1497709, at *5 (E.D. La. July 2, 2004).

[68] Id.

[69] Colson v. Avnet, Inc., 687 F. Supp. 2d 914, 929–30 (D. Ariz. 2010).

[70] Burkhart-Deal v. Citifinancial, Inc., No. 07-1747, 2010 WL 457127, at *5 n.14 (W.D. Pa. Feb. 4, 2010) (Ambrose, J.).

[71] Id. at 535.

[72] Id.

Application of a more searching standard is nothing new in FLSA cases where discovery has already changed hands. For instance, in <u>Bunyan v. Spectrum Brands, Inc.</u>, the United States District Court for the Southern District of Illinois explained that "[i]n cases such as this one, where substantial but not all discovery has taken place, the intermediate two-step approach seems particularly appropriate."[73] The parties in <u>Bunyan</u> had previously undertaken at least ten months of discovery, and a list of other potential opt-ins was made available.[74]

The <u>Bunyan</u> Court further summarized its decision to apply an intermediate level of scrutiny as follows:

> It is clear that the parties have conducted a substantial amount of discovery in this case. They have exchanged interrogatories, conducted depositions, and exchanged a large number of documents. The Court cannot close its eyes to the amount of discovery already performed in this action. At the same time, the Court is cognizant that Plaintiffs only seek conditional certification at this point and that discovery is not complete. Taking the intermediate two-step approach permits the Court to determine whether a sound basis exists for proceeding conditionally as a collective action while also considering all evidence available at this time. Additionally, because discovery is not yet complete, conditional certification, if granted, permits Defendants to make a fully informed challenge to certification once discovery concludes. As such, the Court's analysis proceeds under the intermediate approach.[75]

---

[73] No. 07-CV-0089-MJR, 2008 WL 2959932, at *4 (S.D. Ill. July 31, 2008).

[74] <u>Id.</u>

[75] <u>Id.</u>

Interestingly, the decision to permit discovery to influence the substantive standard at certification in <u>Bunyan</u> was derived from a similar approach followed in <u>Bouaphakeo v. Tyson Foods, Inc.</u>, a case that would reach the Supreme Court of the United States in 2015.[76] As the district court in <u>Bouaphakeo</u> explained, "the more onerous second stage analysis" allows the factfinder "to account for all the important facts learned through discovery that inform what putative plaintiffs, if any, are similarly situated to existing plaintiffs. Many other courts have done likewise."[77]

These sentiments were echoed by the United States District Court for the Middle District of Alabama, when it wrote in <u>Holt v. Rite Aid Corp.</u> that "[once] the parties have conducted extensive discovery, it is appropriate to carefully consider the submissions of the parties with respect to the collective action allegations."[78] Specifically, the court in <u>Holt</u> found it appropriate to consider evidence such as declarations presented by the defendants "[b]ecause the issues in this case revolve around whether the day-to-day tasks of Store Managers and Assistant Managers are consistent with their designation as exempt."[79]

---

[76]  564 F. Supp. 2d 870 (N.D. Iowa 2008).

[77]  <u>Id.</u> at 895.

[78]  333 F. Supp. 2d 1265, 1274 (M.D. Ala. 2004).

[79]  <u>Id.</u> at 1275.

The same was true in <u>Thiessen v. General Electric Capital Corp.</u>, where the United States District Court for the District of Kansas applied an intermediate level of scrutiny to the "similarly situated" inquiry after the parties conducted three months of discovery and several individuals had already opted in.[80] The court in <u>Thiessen</u> set out several factors useful for consideration in conditional certification cases where discovery had already changed hands. Those factors included: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations."[81]

Several courts within the Third Circuit have recognized the need for an intermediate level of scrutiny in FLSA cases.[82] Moreover, application of a more searching standard in cases where substantial discovery has already changed hands is, in my view, consistent with the Third Circuit's instructions in <u>Zavala</u>. After all, the crux of that decision is that the primary factor responsible for tightening the standard at certification is the existence of meaningful discovery, even if the case's procedural posture has not yet formally advanced to decertification.

---

[80]  <u>Thiessen v. Gen. Elec. Capital Corp.</u>, 996 F. Supp. 1071, 1081 (D. Kan. 1998)

[81]  <u>Id.</u>

[82]  <u>See, e.g.</u>, <u>In Re: Enterprise Rent-A-Car Wage & Hour Employment Practices Litig.</u>, No. 2:07-CV-01687-JFC, 2010 WL 3447783, at *17 (W.D. Pa. Aug. 13, 2010) (Conti, J.); <u>Reinig v. RBS Citizens, N.A.</u>, No. 15CV1541, 2016 WL 1746848, at *2 (W.D. Pa. May 3, 2016) (Schwab, J.); <u>Villanueva-Bazaldua v. TruGreen Ltd. Partners</u>, 479 F. Supp. 2d 411, 415 (D. Del. 2007).

That significant precertification discovery can influence the appropriate standard for certification is reasonable and broadly applicable. By extension, a more searching standard is particularly uncontroversial where nearly the same exact counsel and parties have already exchanged discovery in two strikingly similar actions. It will not always be the case that existing discovery from a prior case can influence the appropriate standard on a subsequent certification motion in a distinct matter. Rather, district courts will naturally have to consider the extent to which those actions share common litigants and common claims, common facts and common law.

Further, it would be an entirely inefficient use of resources for this Court to conditionally certify a collective action, only to double-back because the bulk of the discovery it already considered has cast an ominous shadow upon the propriety of the ultimate merits. And in many ways, this case is perhaps an extreme example of that principle. For instance, Plaintiffs have filed their motion for class certification pursuant to Federal Rule of Civil Procedure 23 contemporaneous with their motion for conditional certification under the FLSA. Presumably, then, Plaintiffs acknowledge that they have in fact received discovery sufficient to enable them to move for a final substantive determination on their Rule 23 allegations. A similar posture was observed in a case entitled <u>Gandhi v. Dell Inc.</u>

There, the United States District Court for the Western District of Texas recounted
as follows:

> One of the puzzling aspects of this issue in the present case is that the
> parties agreed to a scheduling order which explicitly contemplated
> discovery being conducted before a motion for class certification
> would be filed. As stated above, parties generally move for
> conditional certification early on in a case when little to no discovery
> has been conducted. Given that most cases addressing the standard of
> review for conditional certification base their decision in large part on
> the status of discovery, one would have thought that if the parties
> were agreeing to a discovery schedule, they would also have agreed
> on the standard to be applied in determining if this case should
> proceed as a collective action. That is not the case, however. At the
> hearing, Plaintiffs' counsel stated that it was his understanding that
> discovery would be very preliminary and limited in scope, and
> therefore, the Court should review the collective action certification
> under the more lenient, initial review standard. Defense counsel, on
> the other hand, argued that because several months were set aside for
> discovery, because thousands of pages of documents have been
> exchanged, and because nearly twenty depositions have been taken,
> using the lenient standard—which is predicated on the assumption
> that little or no discovery has occurred—would be inappropriate here.

> There is merit to both sides' contentions on this issue. Plainly,
> because of the amount of discovery conducted to this point, this is not
> a classic case where the lenient standard is clearly appropriate. The
> parties contemplated that they would conduct discovery before the
> certification issue would be decided, and, given this, it does not seem
> wholly appropriate to use a very lenient standard, particularly when
> such a standard was adopted for situations when little or no discovery
> had been conducted. Further, the case has been pending for more than
> a year, and the parties had six months to conduct what the scheduling
> order described as the "discovery related to Plaintiff's Anticipated
> Motion for Certification."[83]

---

[83] No. A-08-CA-248 JRN, 2009 WL 1940144, at *5 (W.D. Tex. July 2, 2009).

I also sense that for all of the discussion about lenient versus intermediate standards and the various stages of scrutiny, a district court's role in disposing of conditional certification motions has become increasingly entangled in semantics.[84] The end relationship is much more straightforward: the more discovery you have received, the more searching a standard to which your motion to certify will be held. The reasoning is just as compelling: the plaintiff has received the discovery it asked for—now it needs to support its allegations.

This was the tenor of the oral argument offered by Annette A Idalski, Esquire, counsel for the Defendant. She offered the following rebuttal to counsel for Plaintiffs' contention that a bifurcated discovery militated for application of the most lenient standard possible:

> So what level is evidence is required? We're past the modest factual showing. And most courts—we cited to the <u>Creely</u> case, which actually has a good analysis from the court—several different courts as to what should the standard be at this point. If there is extensive discovery conducted, the plaintiff has to make a modest plus factual showing, not just a modest showing. And courts are pretty clear on that. We're not at the preponderance of the evidence standard. The court did bifurcate discovery.

> Judge Fischer did bifurcate discovery. But quite frankly, so much discovery was conducted in the last six months I'm not sure if there is any necessary discovery necessary to be done conducted going forward. I think the factual record is complete. It appears to be, for the most part, complete.

---

[84] <u>See, e.g.</u>, <u>Reinig v. RBS Citizens, N.A.</u>, No. 15CV1541, 2016 WL 1746848, at *2 (W.D. Pa. May 3, 2016) (noting that the "intermediate" label was "a distinction without a difference" given the probative evidence that existed in the record).

. . .

I don't know how much more we can prove here. In 20 years I've never had a case with this much evidence at a motion for conditional certification stage. Typically two months after the case gets started, the plaintiff will file maybe an affidavit and have some evidence or allegation of an inference of a violation, and the Court has no other evidence to look at. So of course, the Court has to grant conditional certification, because there is no evidence to rebut. Here we did six months of discovery. So be careful what you ask for.[85]

Accordingly, this Court will follow the lead of so many district courts before it by requiring that Plaintiff make at least an intermediate showing that any opt-ins are "similarly situated" to the named representative. This "intermediate" or "modest plus" standard requires that Plaintiff make "some factual showing that the similarly-situated requirement is satisfied," "as a result of the discovery as measured against the original allegations and defenses."[86]

> **2.    The named and opt-in Plaintiffs are not similarly situated, because they held different positions, worked for different clients and different supervisors on different projects in different states, and performed different work, all pursuant to localized policies and individualized salary agreements.**

Section 216(b) of the FLSA permits certification of a collective action only if the Court determines that the opt-in plaintiffs are "similarly situated" to the named plaintiffs. Although the term "similarly situated" is not defined by that provision, "[t]he United States Court of Appeals for the Third Circuit has identified

---

[85]    Tr. of Nov. 21, 2016 Oral Argument at 98:16–25; 111:20–112:09.

[86]    See id. Creely v. HCR ManorCare, Inc., 789 F. Supp. 2d 819, 827 (N.D. Ohio 2011).

relevant factors to consider as part of this analysis: 'whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment.'"[87]

District courts within the Third Circuit's vicinage that have applied this guidance from the appellate court generally have grouped their analysis into three subparts: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant; and (3) fairness and procedural considerations."[88]

"The first factor assesses the opt-in plaintiffs' job duties, geographical location, supervision, and salary."[89] At that stage, "allegations of an overarching policy are insufficient, and plaintiffs are required to produce substantial evidence of a single decision, policy or plan."[90] "The second factor concerns whether potential defenses apply to the opt-in class as a whole or whether many different defenses will be raised with respect to each individual opt-in plaintiff."[91]

---

[87] Karlo v. Pittsburgh Glass Works, LLC, No. 2:10-CV-1283, 2014 WL 1317595, at *17 (W.D. Pa. Mar. 31, 2014), aff'd, No. 15-3435, 2017 WL 83385 (3d Cir. Jan. 10, 2017) (Smith J.) (quoting Zavala, 691 F.3d at 536–37).

[88] Kuznyetsov v. W. Penn Allegheny Health Sys., Inc., No. CIV.A. 10-948, 2011 WL 6372852, at *3 (W.D. Pa. Dec. 20, 2011) (Ambrose, J.).

[89] Andrako v. U.S. Steel Corp., 788 F. Supp. 2d 372, 378 (W.D. Pa. 2011) (Ambrose, J.).

[90] Moss v. Crawford & Co., 201 F.R.D. 398, 409–10 (W.D. Pa. 2000) (internal quotation marks omitted).

[91] Andrako v. U.S. Steel Corp., 788 F. Supp. 2d 372, 378 (W.D. Pa. 2011).

Importantly, the third and over-arching factor, which centers on fairness, efficiency, and procedural considerations, requires the district court to consider whether the litigation "would require inquiry into the employment situation of each plaintiff rather than on a broad scale approach to the employment situation of the group."[92] Analysis of these factors should be made in light of § 216(b)'s "primary objectives": (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity."[93] "The court must also determine whether it can coherently manage the class in a manner that will not prejudice any party."[94]

Turning to the instant matter, I conclude that "Plaintiffs have failed to satisfy the 'similarly situated' standard. The similarities among the proposed plaintiffs are too few, and the differences among the proposed plaintiffs are too many."[95] I begin with the first factor, the disparate factual and employment settings of the individual plaintiffs. "To weigh in favor of collective treatment, similarities must 'extend beyond the 'mere facts of job duties and pay provisions,' 'and be viewed in light of

---

[92] Lusardi v. Xerox Corp., 118 F.R.D. 351, 360 (D.N.J. 1987).

[93] Moss v. Crawford & Co., 201 F.R.D. 398, 410 (W.D. Pa. 2000) (citing Hoffmann–La Roche, Inc. v. Sperling, 493 U.S. 165, 170 (1989)).

[94] Moss, 201 F.R.D. at 410. Accord Andrako v. U.S. Steel Corp., 788 F. Supp. 2d 372, 378 (W.D. Pa. 2011).

[95] Zavala, 691 F.3d at 537–38.

the claims asserted.'"[96] Indeed, "being similarly situated does not mean simply

sharing a common status, rather, it means that one is subjected to some common

employer practice that, if proved, would help demonstrate a violation of the

FLSA."[97] "General allegations of an overarching employer policy 'are insufficient,

and plaintiffs are required to produce substantial evidence of a single decision,

policy, or plan.'"[98] Thus, "where an employer maintains a formal policy of lawful

compensation, plaintiffs must present 'substantial evidence that he employer, in

fact, shirked its FLSA responsibilities.'"[99]

    GIFS staffs its clients' projects with many different types of inspectors,

including: Chief Inspectors, Assistant Chief Inspectors, COR Inspectors, Corrosion

Inspectors, Electrical and Instrumentation Inspectors, Environmental Inspectors,

Safety Inspectors, Utility Inspectors, Welding Inspectors, and Coating

Inspectors.[100] Each type of inspector has different qualifications, expertise, and

performs different job duties.[101] Nevertheless Plaintiff seeks certification of

collective action generically comprising "all current and former employees of

---

[96]  <u>Martin v. Citizens Fin. Grp., Inc.</u>, No. CIV.A. 10-260, 2013 WL 1234081, at *3 (E.D. Pa. Mar. 27, 2013) (quoting <u>Zavala v. Wal Mart Stores, Inc.</u>, 2010 WL 2652510, at *3 (D.N.J. June 25, 2010).

[97]  <u>Zavala v. Wal Mart Stores Inc.</u>, 691 F.3d 527, 538 (3d Cir.2012).

[98]  <u>Martin</u>, 2013 WL 1234081, at *3 (quoting <u>Andrako</u>, 788 F.Supp.2d at 378).

[99]  <u>Martin</u>, 2013 WL 1234081, at *3 (quoting <u>Camesi v. University of Pittsburgh Med. Cent.</u>, 2011 WL 6372873, at *4 (W.D.Pa., Dec.20, 2011)).

[100]  ECF No. 156 at 12.

[101]  <u>Id.</u>

[GIFS] who performed work as a pipeline inspector in the United States in any workweek between three years prior to the date of the Court's Order and the present."[102] The proposed class otherwise embraces no limitations based on geography, timeframe, client, position type, or project nature, though it does incorporate a carve-out for three separate projects where workers were believed to not have suffered any unlawful treatment.[103]

Since 2011, GIFS has staffed approximately 2,275 employees with over 40 clients across at least 35 states, both on- and off-shore.[104] As Robert J. Sprick, the company's Senior Vice President, testified, "[t]he number and type of jobs staffed by [GIFS] on any particular project also varies considerably from project to project, client to client, and over time."[105] This means that "similarly titled jobs, like 'pipeline inspector,' often entail different job duties from project to project, as each client sets the job duties for each [GIFS] employee on its projects."[106]

As recited more fully above, GIFS "generally has no authority to direct the tasks performed by its employees on its clients' respective projects, or control when or how such tasks are performed."[107] Instead, GIFS's clients "generally

---

[102] ECF No. 141 at 1.

[103] See id.

[104] Sprick Feb. 20, 2015 Decl., ECF No. 99 Ex. 7 ¶ 6.

[105] Id. ¶ 9.

[106] Id. ¶ 10.

[107] Id. ¶ 11.

assign work to [GIFS's] employees, and [GIFS's] employees exercise various levels of discretion and independent judgment in performing their assigned tasks."[108] "Job duties also may vary depending upon the portion of a particular project that an employee is assigned, as conditions can vary at different parts of a worksite."[109]

Thus, because GIFS is a staffing company, its inspectors' duties depend upon the demands of each particular client.[110] In fact, "inspectors are staffed for each particular project according to the needs of GIFS's clients," and "[s]upervision of inspectors may differ on a project-by-project basis depending upon the individual supervisor assigned by the client."[111] Accordingly, GIFS's various clients, not GIFS, "control[ ] each staffed employee's work schedule, whether the job site is open for work on any particular day, and any applicable sick leave and vacation policies."[112]

Courts disposing of certification motions in natural gas drilling cases must recognize that, by the very nature of the industry, distinctions between job sites and the nature of any two projects introduce a certain variability into the duties of natural gas workers. Such is the nature of a transcontinental energy enterprise: Not

---

[108] Id.

[109] Id. at 10.

[110] ECF No. 156 at 12.

[111] Sprick May 6, 2016 Decl., ECF No. 99 Ex. 8 ¶ 8.

[112] Sprick 2015 Decl. ¶ 16.

only do different types of inspectors perform different tasks, but those tasks also vary depending upon worksite.

For instance, the evidence uncovered in discovery reveals that a utility inspector on a pipeline project might work to ensure that the project is carried out safely, that the ditch is properly excavated, and that the right-of-way is cleared in accordance with specifications.[113] However, utility inspectors working on a project during later stages would be charged with, for example, ensuring that the pipeline is installed in a stress-free condition or ensuring that the appropriate rock shield, padding, and compacting equipment are used during removal.[114] However, the named Plaintiff here, a utility inspector on a compressor station project, would not perform any of those tasks.[115] Rather, he would have an entirely distinct set of job responsibilities specific to the regulated functioning of the compressor station.[116]

Again, a utility inspector on a pipeline construction project might test soil compaction, whereas a utility inspector on a compressor station project is likely to inspect the pouring of concrete and review structural issues involving the erection of a building.[117] A welding inspector on a pipeline construction project primarily

---

[113] Sprick 2016 Decl. ¶ 22.

[114] Id.

[115] Id.

[116] Id.

[117] May 5, 2016 Decl. of Robert Tate, ECF No. 99 Ex. 9 ¶ 12.

reviews one kind of weld made repeatedly as sections are added to the pipeline.[118]

However, a welding inspector at a compressor station would inspect multiple kinds

of welds made pursuant to multiple weld procedures and which might involve

pipeline, tubes, air piping, or structural steel.[119] These processes pose "unique

circumstances and challenges that are different from welding in the field on a

pipeline project."[120]

Recall Table 1 from above, which lists the pertinent employment

characteristics of each of the Plaintiffs:

| Name | Time Worked | States Worked | Job Title(s) | Client(s) |
|------|-------------|---------------|--------------|-----------|
| Thomas Sloane | April 2014-October 2014 | OK, PA | Welding Inspector | Kinder Morgan |
| Allen Hinkle | August 2012-December 2012; October 2013-March 2014 | MO, WV | Welding Inspector | Enbridge; MarkWest |
| Justin Bish | June 2011-March 2014 | OH, WV | Assistant Chief Inspector; Utility Inspector | MarkWest |
| Richard Stapleman | October 2013-December 2013; March 2015-June 2015 | AZ, NM, TX | Chief Inspector; Quality Control Inspector | Kinder Morgan |

---

[118] Id. ¶ 13.

[119] Id.

[120] Id.

| Name | Time Worked | States Worked | Job Title(s) | Client(s) |
|------|-------------|---------------|--------------|-----------|
| Rodney LaLonde | March 2012-September 2014; February 2015-June 2015 | NY, OH, WV | Chief Inspector; Assistant Chief Inspector; Field Inspector | MarkWest; Williams |
| Buggs Pollett | June 2012; May 2014-October 2015 | MS | Welding Inspector; Utility Inspector | Panhandle Energy; Gulf South Pipeline |

From my perspective, this overview reveals that, despite the lengthy time period during which this litigation has been percolating, counsel for Plaintiffs has produced but a smattering of potential cross-country participants. The opt-ins share no common thread, and they offer virtually zero reasons why, for instance, resolution of an FLSA case as to a utility inspector who worked for Panhandle Energy in Mississippi is any way comparable to or in any way would expedite that brought by a Chief Inspector working for MarkWest in New York. To the contrary, the Court is left with a handful of heterogeneous claimants who worked in different locations, in different positions, for different clients and supervisors, under different pay agreements.

Plaintiffs' ultimate fallback position is one of conciliation rather than aggression: if the Court rejects nationwide certification, it should instead certify a class on a statewide basis instead. There are three problems with that argument.

First, that a collective action fails certification on a nationwide basis does not automatically mean that the nationwide shoe was too large, so a statewide shoe must fit just right. In fact, as here, it could mean that neither approach is supported by the facts. Taken to the extreme, counsel for Plaintiffs would have this Court certify separate FLSA collective actions for each individual project for each individual client in each individual state—and how, if at all, would such an approach further judicial economy?

Second, it is not the Court's task to draw appropriate subclasses on counsel for Plaintiffs' behalf. If Plaintiffs believe that a more aptly defined subclass is appropriate, then they should present supporting evidence accordingly.

Third, even were the Court to draw a narrower class, such a class would likely be doomed from the outset. This case was brought in federal district court in Pennsylvania, though only one claimant (the named Plaintiff) ever worked at a Pennsylvania job site according to the pertinent declarations.[121] Further, scouring the employment circumstances of the putative class reveals that the only other potentially viable subclass would perhaps be that comprised of individuals who worked at the MarkWest Ohio site. The problem with that subclass is, of course, that it was already expressly rejected in Hughes.

---

[121] See, e.g., John v. Nesco Serv. Co., No. 4:15-CV-253, 2016 WL 7757388, at *1 (S.D. Tex. June 10, 2016) ("[T]he Court will deny St. John's motion for class certification because no one else has expressed interest in opting into this lawsuit.").

Taking all of these factors into consideration, Plaintiffs have failed to show the requisite similarity in employment circumstances required to obtain certification. Discovery has plainly not furthered their claims. To the contrary, it has largely debunked them. Even though I have applied a more stringent lens than usual, I believe it is also important to note for the record that I have serious reservations about whether the hodge-podge of claimants presented by counsel for Plaintiffs at this late stage would even be sufficient the most lenient of standards.

As the Defendant here aptly notes: Despite the significant variance that attends the inspector position, "Plaintiff's proposed nationwide class includes every kind of inspector on every kind of project for every client in every state."[122] Accordingly, certification and facilitation of notice will be denied for those reasons.

> ### 3. Because the members of the putative class are so diverse, resolution of Defendant's exemption defenses will require significant individualized factfinding, which Plaintiffs have failed to show would be aided by certification in any way.

The second factor—the defenses available to the Defendant—also weigh against certification. The exemptions that GIFS contends apply to this case (the administrative and highly compensated exemptions) each have two fundamental elements that must be litigated and decided as to each Plaintiff before entitlement

---

[122] ECF No. 156 at 15.

to overtime can be shown: a job duties test and a salary basis test.[123] The highly compensated exemption clarifies that workers who earn a salary of $100,000.00 or more, whose primary duty includes performing office or non-manual work, and who customarily and regularly performs any one or more of the exempt duties of an executive, administrative, or professional employee, need not be paid overtime. The administrative exemption excepts from overtime payments such workers whose primary duty is office or non-manual work directly related to management or general business operations of the employer or the employer's customers.[124]

As applied to the administrative exemption, "primary duty" means "the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."[125] Importantly, the primary duty includes exercise of discretion and independent judgment with respect to matters of significance.[126] Thus, "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the

---

[123] 29 C.F.R § 541.200 (administrative); § 541.601 (highly compensated).

[124] 29 C.F.R § 541.200.

[125] Department of Labor, Fact Sheet #17C ("Administrative Exemption"), available at https://www.dol.gov/whd/overtime/fs17c_administrative.pdf.

[126] See id.

various possibilities have been considered."[127] Factors to consider include, but are

not limited to:

> whether the employee has authority to formulate, affect, interpret, or
> implement management policies or operating practices; whether the
> employee carries out major assignments in conducting the operations
> of the business; whether the employee performs work that affects
> business operations to a substantial degree; whether the employee has
> authority to commit the employer in matters that have significant
> financial impact; whether the employee has authority to waive or
> deviate from established policies and procedures without prior
> approval, and other factors set forth in the regulation.[128]

"The fact that an employee's decisions are revised or reversed after review does

not mean that the employee is not exercising discretion and independent

judgment."[129]

### a.  The variety in job duties and discretion exercised by the putative class members precludes certification.

"Application of the administrative exemption is fact specific."[130] Thus,

although "the need to examine the facts of an employee's work does not

categorically preclude collective determination of exemption," certification is

rendered less feasible in cases where plaintiffs have failed to produce "evidence

---

[127] Id.

[128] Id.

[129] Id.

[130] Williams v. U.S. Bank Nat. Ass'n, 290 F.R.D. 600, 606 (E.D. Cal. 2013).

indicat[ing] that prospective class members' job duties were substantially similar."[131]

District courts in the Third Circuit have hesitated to grant nationwide certification in exemption cases where plaintiffs have failed to adduce sufficient evidence of similarity. For instance the United States District Court for the District of New Jersey has explained that "[u]nsurprisingly, determining whether an employee is exempt involves a fact intensive inquiry. . . . Acknowledging that reality, a number of courts have declined to certify proposed classes of financial advisors who claim they were misclassified as exempt."[132] In addition, as the United States District Court for the District of Delaware has explained "[i]f proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable."[133]

Based upon what discovery has revealed here, the level of discretion employed by individual inspectors varies depending upon the particular client and supervisors involved. For instance, when a project is widely dispersed, supervisors cannot always be available to inspectors.[134] Consequently, inspectors often have to observe construction being performed in two or more places at once, requiring

---

[131] Id.

[132] Smith Barney LLC Wage & Hour Litig., No. 11-cv-3121-WJM, 2016 WL 1407743, *5 (D.N.J. Apr. 11, 2016).

[133] Villanueva-Bazaldua v. TruGreen Ltd. Partners, 479 F. Supp. 2d 411, 416 (D. Del. 2007).

[134] ECF No. 156 at 14.

them to make significant judgment calls about how to manage the workflow attendant to both locations.[135] Moreover, depending on the worksite and the particular supervisor, some inspectors were empowered to give orders regarding cutting defective welds, while others could not give that order without approval.[136]

In fact, as a welding inspector at Station 319, Mr. Sloane testified that his job was critical to the operation of the pipeline "[b]ecause natural gas is flammable and explosive, and you really want to contain it. You want good quality welds; otherwise, there's that possibility of not containing it and having a fire and explosion and environmental damage."[137] Without quality welding, a natural gas compressor station can become "[d]angerous to life, health, and environment."[138]

Mr. Sloane further admitted that, at times, his supervisor would permit him a great deal of autonomy in precisely how, where, and in what manner he could perform his day-to-day job duties. For example, when he was working on the Paden Vapor Loop project, Mr. Sloane spent most of his time unsupervised, sitting in his truck doing paperwork.[139] Yet, on the Station 319 project, Mr. Sloane was

---

[135] Id.

[136] Id.

[137] ECF No. 99, Ex. 20, Sloane Dep. 272:03–14.

[138] Id.

[139] See id. at 285:18–23.

required to allocate his resources by walking around looking at welds "all day long."[140]

Mr. Sloane also addressed safety issues that he observed and only periodically assisted with manual work if he got "bored."[141] Stressing the supervisory nature of his position, he explained that "it wasn't part of my job. I was more less just—because I don't—I get bored standing around too long, so I would pick up a wrench and help them bolt something up or something like that, yeah." [142] Further, when a weld failed to pass Mr. Sloane's inspection, the welders "would ask [him his] personal opinion on what [he] would do as a welder to fix that, and [he] might offer my opinion."[143]

The above-referenced exemptions will be relevant to the proper disposition of this case. The Court will have to consider each of the pertinent elements (primary duty, discretion, etc.), as they apply to each potential claimant. However, Plaintiffs leave the Court guessing as to how certification on a nationwide basis would materially advance those determinations.

Just as problematically, no evidence has been put forth to explain why, say, a Chief Inspector at a given site would be subject to the same analysis or outcomes

---

[140] See id.

[141] Id. 288:4-17.

[142] Id.

[143] Id. at 273:21-274:8.

as that of a Utility Inspector with whom he works. Taken to the extreme, "[e]ven employees who hold the same job title do not necessarily perform the same work."[144] That is particularly true where inspectors here were subject to different supervision and expectations depending upon the client and the particular worksite.

The Honorable Donetta W. Ambrose, writing for the United States District Court for the Western District of Pennsylvania in <u>Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.</u>, reached a similar conclusion in a case with a similar posture as this one.[145] In that decision, Judge Ambrose found individualized defenses to be "highly relevant" and likely to "overwhelm" a consolidated proceeding.[146] This was true, because, as here, "[t]he defenses to which Defendants point" would likely be "unique to specific Plaintiffs."[147] "Trying this case in a collective forum," Judge Ambrose concluded, would "prevent Defendants from employing these defenses" and "turn the trial into 824 mini trials."[148] In particular, the defendants would "be unable to delve into the specifics of an individual Plaintiff's situation, supervisor's behavior, etc."[149] "This hardly promotes the

---

[144] <u>Morisky v. Pub. Serv. Elec. & Gas Co.</u>, 111 F. Supp. 2d 493, 498 (D.N.J. 2000).

[145] No. CIV.A. 10-948, 2011 WL 6372852, at *7 (W.D. Pa. Dec. 20, 2011) (Ambrose, J.).

[146] <u>Id.</u> at *7.

[147] <u>Id.</u>

[148] <u>Id.</u>

[149] <u>Id.</u>

efficiency contemplated by collective actions."[150] Judge Ambrose, who also authored the leading decision <u>Andrako v. U.S. Steel Corp.</u>, distinguished that prior case, noting that the differences were more problematic in <u>Kuznyetsov</u> "because the defenses [went] primarily to liability" in the instant matter.[151]

Further, even relegating the ultimate burden of proof to the Defendant on the issue of exemptions, Plaintiffs have offered few suggestions that nationwide certification would in any way streamline those ultimate determinations. For all the Court knows, two workers might appropriately advance an exemption and four not, or six might be exempt and none entitled to overtime. That is an especially troubling realization in light of the discovery that has already been conducted and the sweeping relief that is presently being requested.

Counsel for Plaintiffs' primary response is that the exemption issue can be overlooked, given certain Department of Labor regulations and guidance, which state that "[o]rdinary inspection work generally does not meet the duties requirements for the administrative exemption."[152] Needless to say, that directive, though well-taken by this Court, does not provide a one-size-fits-all answer. Proper

---

[150] <u>Id.</u>

[151] <u>Id.</u>

[152] <u>See</u> Tr. of Nov. 21, 2016 Oral Arg. at 40–42 (quoting 29 C.F.R. § 541.202(g); Weiss Report; DOL Field Operations Report).

resolution requires a thorough consideration of the relevant facts, not blind adherence to a generalized policy statement.

It goes without saying that the above guidance begs the question as to what types of inspection tasks constitute "ordinary inspection work" and what types do not. In fact, the case law appears to distinguish between "ordinary inspection work," such as "filling out checklists" or "conduct[ing] an audit," and inspection work that more closely resembled implementation and assurance of "quality, safety and health, and compliance policy," where the inspectors "have independence . . . to identify the root cause of the problem and determine the best way to fix or correct the problem."[153]

Consequently, federal courts have determined that inspectors may appropriately qualify for an exemption depending upon the type of work they perform. The United States Court of Appeals for the Sixth Circuit, describing circumstances eerily similar to Mr. Sloane's own deposition excerpts, determined that inspectors were exempt in Schaefer v. Indiana Michigan Power Co. The Court reasoned as follows:

> The evidence, viewed in the light most favorable to Schaefer, supports his contention that he spends some of his time performing manual tasks outside the office but this amount of time is not so much that he no longer qualifies for the exemption. Schaefer admits that for the past few years he has spent fifty percent of his time at his desk and that he

---

[153] Zackaria v. Wal-Mart Stores, Inc., No. ED CV 12-1520 FMO, 2015 WL 2412103, at *12 (C.D. Cal. May 18, 2015).

currently spends greater than eighty percent of his time at his desk. Even when he is away from his desk, he does not spend all of his time on manual tasks. Although Schaefer spends some of this time inspecting trucks, examining load bracings, inspecting shipping containers, and examining shipping labels, these "inspection" tasks— even if not performed at his desk—are nonetheless not manual tasks. Schaefer performs manual tasks when he actually picks up a hammer to brace a load or installs or tightens a strap. Accordingly, Schaefer does not spend so much of his time on these manual tasks so as to fall outside exempt status.[154]

Moreover, the set of bare-bones affidavits that Plaintiffs have offered are precisely what the FLSA case law has pejoratively termed "too thin a reed on which to rest a nationwide certification."[155] The affidavits are exceptionally sparse, merely listing each opt-in Plaintiff's job title and work history before reciting a boilerplate conclusion about payment of a day rate and non-payment of overtime. Not even a glimpse of similarity between those affiants can be seen.[156] Judicial focus in cases like this one is properly placed on the economic realities of the employment situation, not on nominal conclusions.[157]  To reason otherwise would disserve Federal Rule of Civil Procedure 1's mandate of a "just, speedy, and

---

[154]  358 F.3d 394, 402 (6th Cir. 2004).

[155]  Guillen v. Marshalls of MA, Inc., No. 09 CIV. 9575 LAP GWG, 2012 WL 2588771, at *2 (S.D.N.Y. July 2, 2012).

[156]  Though Plaintiffs suggest that they all belonged to the same general "division" or "department," Defendant has explained that "department 39" refers to GIFS itself and Mr. Sprick the Senior Vice President, all GIFS employees, inspectors and non-inspectors alike, share those two characteristics. See ECF No. 156 at 5 n.6.

[157]  Cruz v. Conocophillips, No. 4:15-CV-02573, 2016 WL 7106363, at *3 (S.D. Tex. Sept. 23, 2016).

inexpensive determination of every action." For these independent reasons, certification will be denied.

> **b.** **Non-uniformity among the putative class members'
> pay letters and actual compensation received precludes
> certification.**

The parties debate whether this action is more appropriately construed as a "day rate" case or an "exemption" case. The reality is that it draws from both bodies of jurisprudence, and that fact makes the certification burden exceptionally more demanding for Plaintiffs here. Because the applicable exemptions hinge on whether each Plaintiff received a salary, the Court will necessarily need to inquire into the individual employment agreements, pay letters, and economic realities. Unfortunately for the Plaintiffs, that effectively would require this Court to carry out distinct analyses as to each individual claimant, because the respective pay agreements contain materially different language and are unique to each inspector, his experience and discretion, the client, and the particular conditions of employment.

To illustrate, Table 2 below sets forth the actual language from each of the Plaintiffs' pertinent pay agreements. That language is typically distinct and dynamic as between different inspectors and different pay letters. From the outset, I note that counsel for Plaintiffs points to Defendant's issuance of so-called "clarification" letters after a meeting between counsel in 2014 as evidence that

Defendant was attempting to cover the tracks of an illicit compensation scheme. The facts do not bear that charge out. Rather, issuance of the clarification letters are equally consistent with the innocuous theory that the Defendant paid its inspectors a guaranteed salary and moved swiftly to clarify that fact when it was confronted by Plaintiffs' counsel. Without more, such an accusation falls flat.

**Table 2. Comparison of Plaintiffs' Pay Letters**

| Name | Letter Dated | Pay Letter Text |
|------|--------------|-----------------|
| Thomas Sloane | Apr. 11, 2014 | Salary: $386.00/Calendar Day (as approved by client) |
| Thomas Sloane | Jun. 17, 2014 | Fixed Salary: $386.00/Day—Guaranteed seven (7) days per week |
| Allen Hinkle | Aug. 13, 2012 | Salary: $267.00/Day Worked |
| Allen Hinkle | Oct. 24, 2013 | Salary: $419.95/Day Worked |
| Allen Hinkle | Mar. 3, 2013 | Salary: $362.00/Day Worked |
| Allen Hinkle | May 15, 2014 | Salary: $355.00/Day—Five (5) days per week |
| Allen Hinkle | Jul. 22, 2014 | Salary: $355.00/Day—Guaranteed five (5) days per week |
| Allen Hinkle | Apr. 2, 2015 | Fixed Salary: $346.00/Day—Guaranteed six (6) days per week |
| Justin Bish | Jan. 8, 2015 | Fixed Salary: $405.00/Day—Guaranteed five (5) days per week |
| Richard Stapleman | Oct. 1, 2013 | Salary: $337.00/Based on 7 day work week |
| Richard Stapleman | Oct. 30, 2013 | Salary: $330.00/Based on 7 day work week |
| Richard Stapleman | Mar. 12, 2015 | Fixed Salary: $446.00/Day—Guaranteed seven (7) days per week |
| Buggs Pollett | Jun. 7, 2012 | Salary: $367.00/Day Worked (No Overtime) |

| Name | Letter Dated | Pay Letter Text |
|------|-------------|-----------------|
| Buggs Pollett | Jun. 17, 2014 | Fixed Salary: $285.00/Day—Guaranteed six (6) days per week |

Clearly, the terms recounted above paint a wide-ranging portrait of the types of compensation agreements entered with its inspectors, each of which would require individualized interpretation and analysis. "This case thus is a far cry from those where nationwide conditional certification has been granted based on evidence of a company's 'national policy' that itself gave rise to the alleged FLSA violations."[158] To the contrary, the truth or falsity any FLSA violation here hinges upon particularized inquiries unique to each claimant and his employment setting.

Another issue throughout this litigation has been the extent to which salary guarantees must be expressed in writing rather than verbalized. I note, however, that the above overview makes clear that several "guarantees" were memorialized in writing by the Defendant. Thus, somewhat confusingly, for Plaintiffs to prevail, they must contend that a promised amount guaranteed for a set period of days was not a salary.

Just because a salary is expressed as a guaranteed amount per day does not mean that it is no longer a salary—just the same as expressing it in an hourly, bi-weekly, monthly, or quarterly increments does not convert it from a salary to an

---

[158] <u>Martin v. Sprint/united Mgmt. Co.</u>, No. 15 CIV. 5237 (PAE), 2016 WL 30334, at *7 n.11 (S.D.N.Y. Jan. 4, 2016).

"hourly rate," "monthly rate," or "quarterly rate." Moreover, Plaintiffs'

interpretation would require this Court to assume that, in least one case, GIFS

stated in writing that it would pay a "salary" and "no overtime," although in reality

it paid a day rate and owed the worker overtime. That GIFS effectively

memorialized its own FLSA violation would certainly be an absurd interpretation

of that letter.

Likewise, none of the affiants here stated that they did not in fact receive a

guarantee each week; none state that they were not paid if they did not work on a

given day, and none state that their pay fluctuated in correlation to the number of

days they worked each week. Indeed, they were not so deprived, as the below

Payroll Records summaries show that Mr. Sloane, Mr. Stapelman, and Mr.

LaLonde received a constant, guaranteed salary each week that they were

employed by GIFS.[159]

## Figure 1. Sloane Payroll Record

| Employee | Period Start | Period End | Daily Basis[*] | Days Paid | Salary Paid | Notes |
|---|---|---|---|---|---|---|
| Thomas Sloane | 4/12/2014 | 4/25/2014 | $386.00 | 12 | $4,632.00 | First week prorated. 29 C.F.R. § 541.602(b)(6).[**] |
| Thomas Sloane | 4/26/2014 | 5/9/2014 | $386.00 | 14 | $5,404.00 | Apr. 11 pay letter - $386/calendar day |
| Thomas Sloane | 5/10/2014 | 5/23/2014 | $386.00 | 14 | $5,404.00 | |
| Thomas Sloane | 5/24/2014 | 6/6/2014 | $386.00 | 14 | $5,404.00 | |
| Thomas Sloane | 6/7/2014 | 6/20/2014 | $386.00 | 14 | $5,404.00 | June 17 pay letter guarantees 7 days per week |
| Thomas Sloane | 6/21/2014 | 7/4/2014 | $386.00 | 14 | $5,404.00 | |
| Thomas Sloane | 7/5/2014 | 7/18/2014 | $386.00 | 14 | $5,404.00 | |
| Thomas Sloane | 7/19/2014 | 8/1/2014 | $386.00 | 14 | $5,404.00 | |
| Thomas Sloane | 8/2/2014 | 8/15/2014 | $386.00 | 14 | $5,404.00 | |
| Thomas Sloane | 8/16/2014 | 8/29/2014 | $386.00 | 14 | $5,404.00 | |
| Thomas Sloane | 8/30/2014 | 9/12/2014 | $386.00 | 14 | $5,404.00 | |
| Thomas Sloane | 9/13/2014 | 9/26/2014 | $386.00 | 14 | $5,404.00 | |
| Thomas Sloane | 9/27/2014 | 10/10/2014 | $386.00 | 14 | $5,404.00 | |
| Thomas Sloane | 10/11/2014 | 10/24/2014 | $386.00 | 10 | $3,860.00 | Last week prorated. 29 C.F.R. § 541.602(b)(6).[**] |

---

[159] ECF No. 99 Ex. 28.

## Figure 2. Stapleman Payroll Record

| Employee | Period Start | Period End | Daily Basis* | Days Paid | Salary Paid | Notes |
|---|---|---|---|---|---|---|
| Richard Stapleman | 9/28/2013 | 10/11/2013 | $337.00 | 9 | $3,033.00 | First week prorated. 29 C.F.R. § 541.602(b)(6). ** |
| Richard Stapleman | 10/12/2013 | 10/25/2013 | $330.00 | 14 | $4,620.00 | Oct. 30 pay letter guarantees 7 days per week |
| Richard Stapleman | 10/26/2013 | 11/8/2013 | $330.00 | 14 | $4,620.00 | |
| Richard Stapleman | 11/9/2013 | 11/22/2013 | $330.00 | 14 | $4,620.00 | |
| Richard Stapleman | 11/23/2013 | 12/6/2013 | $330.00 | 14 | $4,620.00 | |
| Richard Stapleman | 12/7/2013 | 12/20/2013 | $330.00 | 2 | $660.00 | Last week prorated. 29 C.F.R. § 541.602(b)(6). ** |
| | | | | | TIME OFF | |
| Richard Stapleman | 3/14/2015 | 3/27/2015 | $446.00 | 19 | $8,474.00 | Mar. 12 pay letter guarantees 7 days per week |
| Richard Stapleman | 3/28/2015 | 4/10/2015 | $446.00 | 14 | $6,244.00 | |
| Richard Stapleman | 4/11/2015 | 4/24/2015 | $446.00 | 14 | $6,244.00 | |
| Richard Stapleman | 4/25/2015 | 5/8/2015 | $446.00 | 14 | $6,244.00 | |
| Richard Stapleman | 5/9/2015 | 5/22/2015 | $446.00 | 14 | $6,244.00 | |
| Richard Stapleman | 5/23/2015 | 6/5/2015 | $446.00 | 14 | $6,244.00 | |

## Figure 3. LaLonde Payroll Record

| Employee | Period Start | Period End | Daily Basis* | Days Paid | Salary Paid | Notes |
|---|---|---|---|---|---|---|
| Rodney Lalonde | 2/16/2013 | 3/1/2013 | $462.00 | 14 | $6,468.00 | |
| Rodney Lalonde | 3/2/2013 | 3/15/2013 | $462.00 | 13 | $6,006.00 | |
| Rodney Lalonde | 3/16/2013 | 3/29/2013 | $462.00 | 12 | $5,544.00 | |
| Rodney Lalonde | 3/30/2013 | 4/12/2013 | $462.00 | 12 | $5,544.00 | |
| Rodney Lalonde | 4/13/2013 | 4/26/2013 | $462.00 | 12 | $5,544.00 | |
| Rodney Lalonde | 4/27/2013 | 5/10/2013 | $462.00 | 13 | $6,006.00 | |
| Rodney Lalonde | 5/11/2013 | 5/24/2013 | $462.00 | 14 | $6,468.00 | |
| Rodney Lalonde | 5/25/2013 | 6/7/2013 | $462.00 | 12 | $5,544.00 | |
| Rodney Lalonde | 6/8/2013 | 6/21/2013 | $462.00 | 13 | $6,006.00 | |
| Rodney Lalonde | 6/22/2013 | 7/5/2013 | $462.00 | 13 | $6,006.00 | |
| Rodney Lalonde | 7/6/2013 | 7/19/2013 | $462.00 | 13 | $6,006.00 | |
| Rodney Lalonde | 7/20/2013 | 8/2/2013 | $462.00 | 14 | $6,468.00 | |
| Rodney Lalonde | 8/3/2013 | 8/16/2013 | $462.00 | 14 | $6,468.00 | |
| Rodney Lalonde | 8/17/2013 | 8/30/2013 | $462.00 | 14 | $6,468.00 | |
| Rodney Lalonde | 8/31/2013 | 9/13/2013 | $462.00 | 14 | $6,468.00 | |
| Rodney Lalonde | 9/14/2013 | 9/27/2013 | $462.00 | 14 | $6,468.00 | |
| Rodney Lalonde | 9/28/2013 | 10/11/2013 | $462.00 | 14 | $6,468.00 | |
| | | | | | WORKING IN OHIO | |
| Rodney Lalonde | 2/14/2015 | 2/27/2015 | $425.00 | 12 | $5,100.00 | Feb. 11 pay letter guarantees 5 days per week. |
| Rodney Lalonde | 2/28/2015 | 3/13/2015 | $425.00 | 12 | $5,100.00 | |
| Rodney Lalonde | 3/14/2015 | 3/27/2015 | $425.00 | 12 | $5,100.00 | |
| Rodney Lalonde | 3/28/2015 | 4/10/2015 | $425.00 | 12 | $5,100.00 | |
| Rodney Lalonde | 4/11/2015 | 4/24/2015 | $425.00 | 12 | $5,100.00 | |
| Rodney Lalonde | 4/25/2015 | 5/8/2015 | $425.00 | 12 | $5,100.00 | |
| Rodney Lalonde | 5/9/2015 | 5/22/2015 | $425.00 | 4 | $1,700.00 | Absent 8 days, daughter's graduation. § 541.602(b)(1). *** |
| Rodney Lalonde | 5/23/2015 | 6/5/2015 | $425.00 | 6 | $2,550.00 | Absent 1 week, daughter's graduation. § 541.602(b)(1). *** |
| Rodney Lalonde | 6/6/2015 | 6/19/2015 | $400.00 | 12 | $4,800.00 | June 2 pay letter guarantees 5 days per week. |
| Rodney Lalonde | 6/20/2015 | 7/3/2015 | $400.00 | 12 | $4,800.00 | |
| Rodney Lalonde | 7/4/2015 | 7/17/2015 | $400.00 | 2 | $800.00 | Last week prorated. 29 C.F.R. § 541.602(b)(6). ** |

"An employee will be considered to be paid on a 'salary basis' within the meaning of this part if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of

variations in the quality or quantity of the work performed."[160] "Whether an employee is paid on a salary basis is determined by the compensation actually received, not what is stated in an employment agreement."[161]

Plaintiffs offer no persuasive justifications to depart from such pragmatic reasoning—and for obvious reasons: reasonable review of the above Payroll Records reveals that many of the claimants received the same amount of pay every week they worked for GIFS, a disbursement known in common parlance as a fixed salary.

Highly problematic for Plaintiffs are the existence of days upon which the claimants were not at work but were nevertheless paid the same fixed salary. For instance, the United States Court of Appeals for the Seventh Circuit in Kennedy v. Commonwealth Edison Co. held that power plant supervisors were paid a salary basis and came within the reach of the administrative exemption where "the record indicate[d] that even if an employee had chosen to take the day off without pay, ComEd would not have reduced her salary."[162]

A day away from work without a reduction in pay is precisely what the lead Plaintiff Mr. Sloane was treated to during the 2014 Fourth of July weekend.

---

[160] 29 C.F.R. § 541.602(a).

[161] Desmond McDonald v. Gulf Interstate Field Servs., Inc., No. 2:14-CV-00432, 2017 WL 462249, at *1 (S.D. Ohio Jan. 4, 2017) (citing Orton v. Johnny's Lunch Franchise, LLC, 668 F.3d 843, 847-48 (6th Cir. 2012)).

[162] 410 F.3d 365, 371 (7th Cir. 2005) (Wood, J.).

Deposition testimony reveals that Mr. Sloane only worked for a half-day on Friday, July 4, 2014, went to New York with his fiancée to watch the fireworks on Saturday, July 5, and then did not return to work until Sunday, July 6. When Mr. Sloane turned in his timesheet, he wrote that he did not work on July 5 while he was in New York. Nevertheless, his supervisor ensured that he was paid his full salary.

Mr. Sloane explained as follow during his June 22, 2016 deposition:

Q.    Did you work on July 5, 2014?

A.    July 5th, 2014?

Q.    Yes.

A.    Yes.

. . .

Q.    Where did you work on July 5th?

A.    At home.

. . .

Q.    What did you do when you were working at the apartment on July 5th?

A.    Reports and stuff, going over drawings.[163]

However, three months later, Mr. Sloane's story seemed to have shifted. He revised his prior account as follows:

---

[163]  Sloane Jun. 22, 2016 Dep., ECF No. 182 Ex. 19, at 370–72.

So Friday was the 4th. I worked half a day Friday at the job site and
went to New York City that evening, because I remember we saw
fireworks. And then—or did I—I think I ·worked—yeah, we saw
fireworks in New York City. So I was off Saturday, and then I go
back on Sunday to the job site.[164]

During oral argument, counsel for Plaintiffs attempted to neutralize this

testimony by arguing that GIFS must have paid its employees their entire day rate,

even if they worked for only a few minutes on any particular day. That is a

questionable explanation that contradicts common sense:

THE COURT: It seems odd to me, though, that Gulf Interstate would pay its
workers the same rate per day even if they were to only work
ten minutes in one of those days.

MR. JONES: If they are paying them a day rate, that's not their choice. That
is what a day rate is. In other words, if I'm being paid on a day
rate, I work one hour, I get paid my entire day rate.

THE COURT: Or it suggests—it might suggest to an observer that he's being
paid a salary.

MR. JONES: Again, I do not disagree that it is consistent—that it is
consistent with and looks like a salary. My point is that it is just
as consistent as being paid on a day rate basis. And that is why
when you are paid on a daily basis, there has to be something
else. And that something else is the guarantee.

THE COURT: Why would any sophisticated employer—I would assume for
the sake of argument that Gulf Interstate is a sophisticated
employer—use a day rate then? Why would they do that? What
am I missing?

MR. JONES: In the oil and gas industry, 90 percent of people working out in
a field—in the field are paid on a day rate. I can tell you after

---

[164] Sloane Sep. 25, 2016 Dep., ECF No. 182 Ex. 18, at 106:10–16.

- 52 -

doing, you know, probably not hundreds but at least tens, multiple tens, of cases involving companies out in the oil field, I can tell you that with the exception of one that paid them hourly, everybody else was paid on a day rate.

THE COURT:    That seems a curious way to do business. That's not the business I'm in, obviously. But it seems to me that if they are being paid—if Mr. Sloane is being paid $378 a day, it looks like that's about what it is, that they would be better off putting him on salary to do that. I mean, wouldn't they do that, get ten minutes of work for $378 versus ten hours' worth of work the next day for $378. Which is better? I should think it would be ten hours of work for $378.

That GIFS's contested business practices are consistent with a wholly lawful approach (and "consistent" may be an underestimation based on the evidence) is insufficient at this stage. More is required. As Mr. Sprick explained during several of his depositions, GIFS employees were in fact guaranteed a fixed salary and not paid a day rate, and there were compelling accounting reasons to express the salary payment in the increments in which the company did:

Q.    Okay. Prior to April of 2014, how many days' pay was a pipeline inspector guaranteed regardless of the number of days that they worked?

A.    They were guaranteed six days of pay to make up their guarantee.

Q.    Whether or not they worked those days?

A.    That is correct.

Q.    Okay. Could you identify for me, please, sir, each and every document where it is stated that a pipeline inspector on the MarkWest Ohio project is guaranteed six days of pay prior to April of 2014?

A.    Again, it was—they were verbally notified of their six-day guarantee. And
      it's industry practice if you want to get the employee to work for us, we have
      to make that guarantee.[165]

In a subsequent deposition, Mr. Sprick reiterated:

Q.    And nowhere in Exhibit 9 does it say anything about a six-day guarantee,
      does it?

A.    No, because the guarantee was verbally told to the individual. And the
      reason we state per day worked, it allows us to make permissible deductions
      at the beginning and end of the project as well as to pay him for the seventh
      day if worked. That's the reason, you know, that the day worked is part of
      the way we calculated the guarantee.

Q.    It doesn't say anything about a guarantee, does it?

A.    No, because it's—it was verbally told to him as well as an industry practice
      that all inspectors get a guaranteed salary. And let me add that, you know, all
      of our pay records demonstrate that they got paid a guaranteed salary.[166]

      Plaintiff suggests that the decision by the United States District Court for the

Southern District of Ohio in Fenley v. Wood Grp. Mustang, Inc. militates for the

opposite conclusion.[167] In my view however, the circumstances in Fenley are

entirely distinct from those here. First and foremost, Fenley involved a class of

plaintiffs who had explicitly been characterized as receiving a day rate. In fact, the

defendant classified the plaintiffs as "Non Exempt Day Rate" employees using the

payroll code "DAY."[168] Further, the company's overtime policy in Fenley stated

---

[165]  Sprick Dep. 33:22–34:17.

[166]  Sprick Dep. 60:7–24.

[167]  170 F. Supp. 3d 1063 (S.D. Ohio 2016).

[168]  Id. at 1068.

that "Non-Exempt day rate Mustangers (DAY) receive a day rate that is inclusive of all hours worked, including overtime."[169]

No such smoking guns exist here. To the contrary, whereas the presence of a day rate system was effectively a given in <u>Fenley</u>, whether the opt-in and named plaintiffs were actually paid an unlawful day rate here turns on the text of each worker's pay letter and what that worker <u>actually</u> received. With that foundation in place, it is also important to emphasize that the parties in <u>Fenley</u> had conducted only very limited discovery by the time that the initial motion for conditional certification was filed.[170] In essence, Plaintiffs here have conducted significantly more discovery than was conducted in <u>Fenley</u> but have comparatively less to show for it.

Thus, for all of the preceding reasons, the putative class members are not similarly situated, and individual questions regarding the application of certain exemptions would swallow any economies of scale realized by a collective action. Accordingly, the motion to facilitate notice and certify a collective action is denied.

---

[169] <u>Id.</u>

[170] <u>Id.</u>

**B.      For Parallel Reasons, Plaintiff's Proposed Rule 23 Class Is An Inadequate Vehicle To Adjudicate The Remaining Claims.**

"Rule 23 governs the certification of class actions in federal courts and its requirements are more stringent than those of the FLSA."[171] In particular, because "Rule 23(b)(3)'s predominance requirement is more stringent than the 'similarly situated' requirement under § 216(b)," it would certainly be a rare occurrence for a given putative class to miss the bar for FLSA certification but simultaneously clear Rule 23's correspondingly higher hurdle.[172]

**1.      Because determining one's eligibility for class membership would require particularized, factual inquiries into each worker's pay letters, exempt status, and other employment circumstances, answers common to the class do not predominate over individual ones.**

This lawsuit suffers from two procedural flaws, known colloquially in the class action jargon as "commonality" and "predominance." As the late Justice Antonin Scalia described the commonality requirement in <u>Wal-Mart Stores, Inc. v. Dukes</u>, "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common <u>answers</u> apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the

---

[171] <u>Espinoza v. 953 Assocs. LLC</u>, 280 F.R.D. 113, 123 (S.D.N.Y. 2011).

[172] <u>Camilotes v. Resurrection Health Care Corp.</u>, 286 F.R.D. 339, 355 (N.D. Ill. 2012).

generation of common answers."[173] Consequently, commonality is not satisfied

merely because the plaintiffs "have all suffered a violation of the same provision of

law."[174] Instead, the class claims "must depend upon a common contention."[175]

"That common contention, moreover, must be of such a nature that it is capable of

classwide resolution—which means that determination of its truth or falsity will

resolve an issue that is central to the validity of each one of the claims in one

stroke."[176]

The next hurdle is predominance. A class action may be certified under

Federal Rule of Civil Procedure 23(b)(3) only if "the court finds that the questions

of law or fact common to class members predominate over any questions affecting

only individual members, and that a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy." That rule

enumerates four factors for consideration:

> (A) the class members' interests in individually controlling the
> prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy
> already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of
> the claims in the particular forum; and

---

[173] 564 U.S. 338, 350 (2011).

[174] Id.

[175] Id.

[176] Id.

(D) the likely difficulties in managing a class action.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."[177]

The United States District Court for the Eastern District of Pennsylvania has described predominance as the "counterpart" to commonality.[178] Along the same line, the Third Circuit has stated that "[i]t is often appropriate to discuss commonality and predominance together because the commonality inquiry is subsumed into the predominance inquiry."[179] This is because "[p]arallel with Rule 23(a)(2)'s commonality element, which provides that a proposed class must share a common question of law or fact, Rule 23(b)(3)'s predominance requirement imposes a more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members."[180] For example, as one federal court has concluded "[i]n short, certification is not warranted" if " individual issues relating to eligibility for the administrative, professional, and highly compensated employee exemptions will

---

[177] Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 623 (1997).

[178] Coleman v. Commonwealth Land Title Ins. Co. Mitchell, — F.R.D. —, No. CV 09-679, 2016 WL 4705454, at *5 (E.D. Pa. Aug. 17, 2016).

[179] Reyes v. Netdeposit, LLC, 802 F.3d 469, 486 (3d Cir. 2015) (McKee, C.J.).

[180] Sullivan v. DB Investments, Inc., 667 F.3d 273, 297 (3d Cir. 2011) (Jordan, J.).

predominate over any questions of law or fact that are common to the class members."[181]

Plaintiffs request that the Court certify various Pennsylvania classes of general, supervisory, and non-supervisory inspectors to vindicate state law claims under the Pennsylvania Minimum Wage Act and common law unjust enrichment allegations.[182] "The Pennsylvania Minimum Wage Act [PMWA] mirrors the FLSA. Based on the 'identity of purpose' between those two statutes, Pennsylvania courts employ the same tests used by the federal courts and use federal case law to determine the governing standard."[183] Like the FLSA, the PMWA also recognizes an administrative exemption. "Under the PMWA's administrative employee exemption, anyone employed in a 'bona fide . . . administrative . . . capacity' is exempt from the PMWA's overtime protections."[184]

Similar to my analysis above, Plaintiffs do not offer any evidence or likely sources of evidence that would resolve questions common the class (should such questions even exist) in one stroke. To the contrary, there is a high probability that

---

[181] In re RBC Dain Rauscher Overtime Litig., 703 F. Supp. 2d 910, 968 (D. Minn. 2010).

[182] See ECF No. 126.

[183] Jochim v. Jean Madeline Educ. Ctr. of Cosmetology, Inc., 98 F. Supp. 3d 750, 756 (E.D. Pa. 2015).

[184] Baum v. Astrazeneca LP, 372 F. App'x 246, 248 (3d Cir. 2010) (quoting 43 P.S. § 333.105(a)(5)).

any such class proceedings would devolve into mini-trials, focused on each individual inspector's particular duties, discretion, pay agreements, etc.

The differences that permeate the putative class when viewed through the FLSA lens are just as pronounced under Rule 23. First, there exist significant discrepancies among different positions at different worksites. Hours worked, tasks delegated, and discretion exercised by, for example, a welding inspector in New Mexico will likely provide very little information as to how those same metrics apply to a distinct client's chief inspector in New York. At the very least, Plaintiffs offer no persuasive justification as to why those answers would be universal to the class.

The same is true as it applies to liability in general. Individualized questions clearly will predominate, as this Court will need to review each worker's pay agreements, hours worked, days off, and payroll records. Moreover, any two employees' circumstances are highly independent. That is to say, whether GIFS violated or did not violate the FLSA as to one worker bears little upon whether treatment of any other GIFS employee was lawful or not. Plaintiffs offer no reasons otherwise, and that heterogeneity is a fatal to class certification.

This line of thinking could be reiterated over and over, just by swapping out the variable: the amount of discretion an employee exercises; whether the employee received the same payment each week; whether the employee primarily

worked in a bona fide administrative capacity; whether the employee performed manual work; whether the employee took days off; whether the employee was compensated while away from work; etc. The consequence is the same: individualized questions predominate over questions common to the class.

It is not enough to argue, as Plaintiffs do here, that the common question is simply whether or not the employees were paid a day rate. As just illustrated, the answer to that question depends on a variety of factors and on a number of distinct sub-questions. Moreover, I have no reason to believe that the answer to that question as it pertains to any given claimant would be common to any others—let alone capable of being resolved as to all class members in a single stroke.

To the contrary, Plaintiffs fall well short of offering the kinds of "common proof" necessary to sustain a class action in federal court. As counsel for Defendant cogently summarized:

> First, Sloane does not submit or even describe the "testimony" or "representative sample," making it impossible for the Court to evaluate whether the evidence would be uniform across the class. Second, most of this supposedly "common" evidence either does not exist or is not actually common: there is no relevant "employee handbook" or "policy on exemption determinations;" pay letters and rate sheets are irrelevant to the salary basis test, and are not uniform across the class; "compensation records" are individual to each inspector; and "job descriptions" are not uniform and, according to Sloane, do not accurately reflect job duties anyway. In other words, Sloane's passing reference to "common proof" does not satisfy his

burden of showing predominance, and class certification should be denied.[185]

That the putative class (or subclasses) both fail the commonality and predominance requirements is not the stopping point. I note for the record an additional argument raised by counsel for Defendant's opposition papers. That argument calls into question Mr. Sloane's "typicality." In particular, Defendant contends that were this Court to determine that Mr. Sloane actually was guaranteed a salary, and certainly the evidence points in that direction, then his interests would be atypical of the interests of any putative class member who actually did receive a day rate. I agree. Not only would Mr. Sloane lack the requisite motivation to pursue the class's overtime claims to fruition in such an instance, but such divergence in interests would also negatively impact the pertinent exemptions determination. For that reason, I do believe that, although uncommon, there is a lurking problem with typicality in this case.

Further, I agree with the Defendant that Plaintiffs' proposed subclasses are ill-defined and premature. Not only does it appear that the proposed supervisory and non-supervisory subclasses may omit certain inspector positions, it also could be the case that one of those subclasses is entirely an empty set—in other words, it could be that no member of the putative class is a "non-supervisory" inspector. That Plaintiffs cannot readily place existing claimants in either bucket is not a good

---

[185] ECF No. 182 at 24–25.

sign, given the amount of discovery that has already been conducted at this stage.

In addition, there is a sense that defining subclasses so narrowly eviscerates any

hope of preserving judicial economy. If the Court is asked to divvy up supervisors

and non-supervisors, perhaps it will be classifying each worker on an

individualized basis, and what is the point of a class action, where there exists no

common thread, no common stroke among class members?

For the foregoing reasons, class certification under Rule 23 is inappropriate

here, and the corresponding motion will be denied.

> **2. Owing to his prior convictions and a lack of forthrightness with his own counsel, Mr. Sloane is an inadequate representative, whose propensity for untruthfulness would taint the fair and efficient administration of justice for the other putative class members.**

"Courts of appeals have held that unique defenses bear on both the typicality

and adequacy of a class representative."[186] In particular, the Third Circuit has

explicitly recognized "the challenge presented by a defense unique to a class

representative—the representative's interests might not be aligned with those of

the class, and the representative might devote time and effort to the defense at the

expense of issues that are common and controlling for the class."[187] "A proposed

---

[186] Beck v. Maximus, Inc., 457 F.3d 291, 296 (3d Cir. 2006).

[187] Id. at 297.

class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation."[188]

That a class representative's personal characteristics may be scrutinized is nothing new. In fact, one of the earliest and most persuasive statements of this principle was provided by the late Honorable Malcolm Muir of the Williamsport division of this Court in 1974. Judge Muir explained that "facts regarding the personal qualities of the representatives themselves are relevant, indeed necessary, in determining whether the representative parties will fairly and adequately protect the interests of the class."[189] According to Judge Muir, "Because absent members of the class would be conclusively bound by the results obtained by these representatives and their attorneys, due process requires that they be more than pro forma representatives."[190] Judge Muir also cited the following applicable passage from Wright & Miller, before denying certification on the ground of inadequacy:

> Quality of representation embraces both the competence of the legal counsel of the representatives and the stature and interest of the named parties themselves. The general standard appears to be that the representatives must be of such a character as to assure the vigorous prosecution or defense of the action so that the members' rights are certain to be protected. Thus courts have looked to factors such as the

---

[188] Id. at 301.

[189] In re Goldchip Funding Co., 61 F.R.D. 592, 594 (M.D. Pa. 1974) (internal quotation marks omitted).

[190] Id.

representatives' honesty, conscientiousness, and other affirmative personal qualities.[191]

In cases involving much less dishonesty and criminal conduct than Sloane, courts have found plaintiffs to be inadequate class representatives. See Weisman v. Darneille, 78 F.R.D. 669, 671 (S.D.N.Y. 1978) ("Plaintiff's conviction and subsequent conduct here convince us that he lacks the 'honesty, conscientiousness, and other affirmative personal qualities' required of a class representative"); Kirkpatrick v. Ironwood Communications, Inc., No. C05-1428JLR, 2006 WL 2381797 (W.D. Wash. Aug. 16, 2006) ("Mr. Miller will likely be subject to multiple attacks on his credibility based on his past crimes. These attacks will likely severely limit Mr. Miller's ability to vigorously pursue the interests of absent class members. For these reasons, Mr. Miller is not an adequate class representative."). See also Davidson v. Citizens Gas & Coke Utility, 239 F.R.D. 225, 228 (S.D. Ind. 2006) (adequacy not met due to felony convictions, including burglary and theft); Maddox & Starbuck, Ltd. v. British Airways, 97 F.R.D. 395, 396-97 (S.D.N.Y. 1983) (criminal conviction precluded plaintiff from being class representative).

Mr. Sloane has referred to himself as "an alcoholic and addict who made some irresponsible judgments and decisions."[192] Upon recounting each of his

---

[191] Id. (citing Wright and Miller, FEDERAL PRACTICE AND PROCEDURE, § 1766, pp. 632–634).

[192] Decl. of Thomas Sloane, ECF No. 17 Ex.1 ¶ 4.

criminal history incidents, he notes of a 2010 burglary charge that "Frankly, I do not remember much at all about that night. I was in an alcoholic blackout."[193] These are not defense counsel's characterizations; they are Plaintiff's own words. Three of Mr. Sloane's offenses involved burglary or theft, one charge having followed an attempt by Mr. Sloane to break into a coin laundry machine.[194] In darkly comedic fashion, Mr. Sloane also recounted the facts leading up to a criminal mischief conviction that he sustained <u>while he was incarcerated</u>:

> In 2010, while confined in jail, I was charged and convicted of Criminal Mischief for having damaged the sprinkler head in my cell. Four or five of us were sitting around in my cell and someone said that the sprinkler head would spray foam if you stuck a pencil in it. I didn't believe him, so I stuck the point of a pencil in the hole in the center of the sprinkler head (and it sprayed foam).[195]

My reasoning holds especially true given that the salary basis issue is a core component to this litigation. In sum, then, the outcome of this case may turn upon whether certain workers were paid even for days on which they did not work. This means that Mr. Sloane's credibility and his shifting testimony as to the July 2014 weekend will be placed front-and-center for the jury's determination, following what I would presume to be a thorough cross-examination by defense counsel. Thus, those facets of Mr. Sloane's personal claim is unique to him and uniquely

---

[193] <u>Id.</u> ¶ 5(f).

[194] <u>See id.</u> ¶ 5(b), (c), & (f).

[195] <u>See id.</u>

troubling. The propriety of the other putative class member's claims should not rightfully rise or fall based on personal credibility determinations.

This Court simply cannot in good faith install Mr. Sloane as the chief representative of the remaining class members' interests. This is particularly true, given that a key triable issue would be whether Mr. Sloane was paid on a salary basis. Mr. Sloane's credibility and his shifting story about the July 2014 weekend will both be central to that determination

## V.   CONCLUSION

Consistent with foregoing analysis, Plaintiffs' motions for certification pursuant to 29 U.S.C. § 216(b) and Federal Rule of Civil Procedure 23 are denied. The putative opt-in Plaintiffs are dismissed.

An appropriate Order memorializing my findings and resetting the pertinent case management deadlines follows.


BY THE COURT:


s/ Matthew W. Brann
Matthew W. Brann
United States District Judge